UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. _11-3092-Bondstn_

UNITED STATES OF AMERICA

vs.

FRANCISCO OROPESA,

       Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? \_\_\_\_\_ Yes  __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? \_\_\_\_\_ Yes  __X__ No


                              Respectfully submitted,

                              WIFREDO A. FERRER
                              UNITED STATES ATTORNEY

By: _/s/ Brian Dobbins_
                              BRIAN N. DOBBINS
                              Assistant United States Attorney
                              Court ID No. A5501182
                              11200 NW 20TH Street, Suite 101
                              Miami, Florida 33172
                              Tel: (305) 715-7647/ Fax: (305) 715-7639

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Francisco Oropesa,<br><br>_____<br>Defendant(s) | ) ) ) ) ) ) )    Case No. 11-3092-Bandstra |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 16, 2011___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. § 841(a)(1) | Possession with the intent to distribute a mixture and substance containing a detectable amount of oxycodone, a schedule II controlled substance. |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

John M. Clayton, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___08/17/2011___

_____
*Judge's signature*

City and state: ___Miami, Florida___   Ted E. Bandstra, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, John M. Clayton, your Affiant, being duly sworn, depose and state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and make arrests for violations of Title 21 of the United States Code, and offenses enumerated in Section 2516 of Title 18. I have been a Special Agent for the Drug Enforcement Administration (hereinafter DEA) for approximately two years. I received nineteen (19) weeks of training in narcotic investigations at the DEA Training Academy in Quantico, Virginia. The training consisted of various investigative techniques such as undercover operations, use and control of confidential sources, and moving, stationary and electronic surveillance, which includes cellular telephones, email, and IP communications. I also received legal training in regards to enforcement of drug laws of the United States of America. Prior to being employed by the Drug Enforcement Administration, I worked as a police officer in the Marietta Police Department (MPD) in Marietta, Georgia for nine years and the Paulding County Sheriff's Office (PCSO) in Paulding County, Georgia for three and a half years.

2. During my approximate fifteen years in law enforcement, I have become familiar with investigations and the enforcement of state and federal drug laws. Based upon this experience, I have become well versed in the methodology utilized in narcotics trafficking and money laundering operations, the specific type of language used by narcotics trafficking organizations, and the unique trafficking patterns employed by narcotics organizations. In addition, I am also familiar with the various methods generally utilized by traffickers to transport controlled substances through airports and via common carriers (e.g., United States Postal Service, Federal

Express, United Parcel Service, small parcel carriers, freight forwarding services, etc.). I have conducted physical surveillance, electronic surveillance, and wire surveillance in many types of criminal cases, including a significant number of drug cases. I have arrested numerous individuals for various drug violations and have spoken with many drug dealers, and confidential sources concerning the methods and practices of drug traffickers.

3. I have personally participated in the investigation into Francisco OROPESA and his oxycodone trafficking activities, as well as discussed this matter with other law enforcement officers who have participated in the investigation, and I have knowledge of the facts set forth below. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support a complaint charging OROPESA with Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), I have not included every detail of every aspect of the investigation. All conversations and statements described in this attachment are related in substance and in part and are not word-for-word transcriptions or quotations.

4. The DEA began investigating OROPESA'S drug trafficking activities in August 2011, based upon information provided by a confidential source ("CS"). The CS informed the DEA that the CS had purchased large quantities of oxycodone in the past from OROPESA without a prescription. The CS further informed the DEA that OROPESA was not a licensed medical professional who had the ability to write or fill prescriptions. The CS provided the DEA with OROPESA'S phone number and a description of the business location that OROPESA worked from. Additionally, the CS agreed to make consensually recorded telephone calls and record any meetings with OROPESA.

5. The investigation revealed that OROPESA operated Kendall Regional Medical Services, Incorporated, at 6355 SW 8th Street, Units 2E and 3E, in Miami, Florida. This business purports to provide physical rehabilitation and massage therapy to individuals. The investigation revealed that OROPESA is not a licensed medical practitioner, and OROPESA does not have any legal authority to prescribe or dispense any prescription medication.

6. At the direction of the DEA, the CS made a number of phone calls with OROPESA to arrange to buy 10,000 pills at a price of twelve dollars ($12.00) per pill. At the direction of the DEA, the CS was acting as a buyer and distributor of oxycodone in the Northeastern United States. On August 14, 2011, the CS made a consensually recorded and monitored phone call to OROPESA. During the conversation the CS told OROPESA that the CS just arrived in South Florida and would see OROPESA the next day. OROPESA asked the CS, "You got me?" The CS relayed to the DEA agents that this meant that OROPESA was asking if the CS had the money to purchase the oxycodone. The CS replied that the CS would meet OROPESA the next day to conduct the transaction. OROPESA requested that the CS meet OROPESA in the morning, and the CS agreed.

7. On August 15, 2011, the CS placed a consensually monitored and recorded telephone call to OROPESA and explained that the CS would not be able to meet OROPESA until the August 16, due to some problems that had occurred with the CS's driver. OROPESA pleaded with the CS to hurry, because OROPESA needed the money.

8. On August 16, 2011, the CS placed a consensually recorded and monitored telephone call to OROPESA. During this conversation, the CS informed OROPESA that the CS would be arriving at the business soon. OROPESA put a female on the telephone to tell the CS, in

3

English, that the CS needed to arrive at the OROPESA'S business before noon, so that OROPESA could go get the remaining oxycodone pills to supply the CS. OROPESA could be heard in the background instructing the female in Spanish on what to tell the CS. The female told the CS that OROPESA need "thirty," which meant $30,000 to take to the pharmacy. Later in the conversation, the female stated that OROPESA needed the $30,000 before noon.

9. At approximately 12:38 PM, the CS was transported to OROPESA's office located at 6355 SW 8th Street, Units 2E and 3E in Miami, Florida, by an undercover DEA agent. Prior to traveling to OROPESA'S office, the CS was provided with an audio and video recorder. OROPESA opened the controlled access gate to the parking area at the office for the agent and the CS to enter the building. OROPESA walked the CS to unit 3E from the parking area. Inside the office, OROPESA explained that OROPESA only had 6,500 pills of oxycodone to sell to the CS on that day, because the CS had arrived after noon. OROPESA explained that he would take the money and purchase the remaining 3,500 pills from the pharmacy the next day. OROPESA would then make arrangements to provide the CS with the remaining 3,500 pills. The CS then returned to the undercover DEA agent in the parking garage and retrieved $120,000 to pay OROPESA for the 10,000 pills. The $120,000 was contained in a white FedEx bag. Prior to traveling to OROPESA'S business, DEA agents had photographed the serial numbers for the money. The $120,000 was in $100 bills, and rubber-banded in stacks of $20,000.

10. The CS then returned and provided OROPESA with the money, which OROPESA then counted. OROPESA then gave some of the money to two female employees, Mailin Hernandez and Yiranys Gasca. The two women then left the office, and the CS relayed that information to the DEA agents conducting surveillance at the business. Agents observed the two females leave the office building driving a white Range Rover and subsequently stopped the vehicle. After

4

receiving consent to search the Range Rover, agents found bundles of $100 bills, bottles of blue pills, later identified as oxycodone, and prescriptions for oxycodone and Percocet that had not been filled yet. Gasca, the driver of the Range Rover, stated that she was instructed by OROPESA to take the prescriptions, oxycodone, and the money until OROPESA told her what to do with the items. The items described in the Range Rover were seized as evidence. The money matched the bundling and denominations of the currency provided to the CS by DEA to make the purchase of the oxycodone.

11.   At approximately 2:00 PM, the CS returned to the undercover agent and the vehicle with a clear plastic bag that contained numerous blue pills, later identified as oxycodone. The CS also provided two $100.00 bills and advised OROPESA that he did not want them because they were taped together. Agents secured the evidence at the scene and proceeded back to Unit 3E. OROPESA was then taken into custody. OROPESA was read his Miranda warnings by agents in English and Spanish, at which time he signed a Spanish form indicating his consent to search the office. Based upon OROPESA'S consent, the agents conducted a search of the office. During the search, several hundred full and empty pill bottles were discovered within the business, as well as the money that the CS used to purchase the oxycodone. The agents also seized a number of unfilled prescriptions that were signed by doctors and prescribed to various individuals.

12.   OROPESA waived his Miranda rights and agreed to make statements. OROPESA stated that he was not a doctor, nor was he legally able to fill or provide prescription of controlled substances. OROPESA told the agents that he employed approximately 300 individuals to obtain prescriptions for primarily oxycodone from physicians in the area. These individuals would obtain the prescriptions by posing as patients in need of the medication. OROPESA also

5

stated that he sometimes transported the patients to the doctors' offices, so that they could obtain the prescriptions. OROPESA instructed the individuals obtaining the prescriptions to fill the initial prescription, which they could keep, and provide OROPESA with the bottles for refill. OROPESA then paid the individuals obtaining the prescriptions $250 for each prescription they successfully obtained.

13. Additionally, OROPESA told the agents that some of the individuals employed to obtain prescriptions would provide OROPESA with the signed prescription. OROPESA, or other members of his business, would then fill the prescriptions at local pharmacies. OROPESA then stated that he would buy the pills from the pharmacy at a price of five dollars per pill.

14. Based upon my knowledge of this investigation to date, I submit that there is probable cause to believe that OROPESA obtained, possessed, and distributed controlled substances, specifically oxycodone, illegally for the purpose of profit, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NAUGHT.

_____
John M. Clayton
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
on this 17th day of August, 2011.

_____
HONORABLE TED E. BANDSTRA
UNITED STATES MAGISTRATE JUDGE